ARMSTRONG, Respondent, vs. INDUSTRIAL COMMISSION and others, Appellants.

*November 19—December 15, 1948.*

For the appellant Industrial Commission there was a brief by the *Attorney General* and *Mortimer Levitan,* assistant attorney general, and oral argument by *Mr. Levitan.*

For the appellants F. G. Findley Company and Hartford Accident & Indemnity Company there was a brief by *Quarles, Spence & Quarles,* attorneys, and *Kenneth P. Grubb* and *Richard S. Gibbs* of counsel, all of Milwaukee, and oral argument by *Mr. Grubb.*

For the respondent there was a brief by *Otjen & Otjen* of Milwaukee, and oral argument by *C. J. Otjen.*

WICKHEM, J.  Elijah Grattan Armstrong was the husband of plaintiff.  The parties were married in 1930, and lived in Michigan until June, 1942, at which time they came to Milwaukee where Armstrong obtained employment with F. G. Findley Company, producers of industrial adhesives. Within a few months he moved his family from Michigan to Milwaukee and worked at the Findley Company, learning the business.  He was thereafter given a job as traveling salesman in Michigan.  His family continued to reside in Milwaukee for a year and four months while he traveled in Michigan for the Findley Company.  On July 1, 1944, he moved his family to Adrian, Michigan, so that he could get home every week end.  He had ultimate hopes of being stationed permanently in Milwaukee.  It was the practice of Armstrong to go to Detroit about once a month and to spend a week or two there.  For the purposes of his business in Detroit he had rented a room in a private home which he maintained continuously at his employer's expense.  He had a sister at Windsor, Canada, and frequently visited there when

he was in Detroit.  Before leaving his home on November 12, 1945, for a regular business trip he stated to his wife that he might visit his relatives in Windsor on the 14th.  He arrived in Detroit on November 12th and made calls on Monday and Tuesday.  On the morning of November 14th he informed the owner of the house where he roomed that he might not be home that night because he was going to visit relatives in Windsor.  He made four business calls, his last for the day being at the Koppitz Melcher Brewery where he came about 2 :30 and left about 4 o'clock.  The brewery was located on the Detroit river.  The brewery fronts on East Atwater street which runs approximately east and west and on DuBois street which runs approximately north and south, and terminates approximately at the river and the south end of the brewery was close to the edge of the river.  There was a boat slip just west of DuBois street running about one hundred feet north toward the brewery.  An eighteen-inch abuttment extended along the east side of this boat slip.  The north end of the boat slip was about sixty-eight feet south of the door where Armstrong left the brewery and the riverbank was about one hundred sixty-eight feet south of the door.  While the matter does not appear to have been testified to by any witnesses a map introduced by stipulation seems to indicate a narrow invasion of the river extending to the north and west and roughly opposite the door above referred to.  This was bounded on the west by a strip of land about fifty feet wide parallel to DuBois street.

Armstrong entered the brewery on DuBois street at a point about one hundred sixty-eight feet from the river.  Upon concluding his business and leaving the brewery he inquired for the best way to get to Windsor because he had a dinner engagement with a relative.  Nothing is known of his whereabouts from the time he left the brewery until his body was found in the Detroit river.  The body was not found until January 6, 1946, and it was on the Canadian side of the river

about five miles south and east of the brewery and in the vicinity of the town of Ojibway which is south of Windsor. The coroner who investigated the death was of the view that Armstrong's body had been in the water for from six to twelve hours but the pathologist who examined the body at the request of the coroner testified that the body had been in the water for five or six weeks. Both agreed, however, that there is no accurate or scientific way to determine how long a body has been in the water. Deceased had not been seen in Canada—at least by anybody who was produced at the hearing. There is proof that the current of the Detroit river swings from the vicinity of the brewery toward Windsor, back to the American side, and then back to the vicinity where the body was found.

The commission found that Armstrong's death did not occur in the course of his employment and that it did not arise out of his employment. The trial court set aside these findings and remanded the controversy for further proceedings.

The parties have argued the inferences with great ability and ingenuity. The commission relies on the following evidence: Decedent had finished his business for the day, announced several times that he was going to Windsor, and told his landlord that he might go to Windsor for the night. He inquired at the brewery as to the best route to reach Windsor. He was found in Canada where he had no occasion to be on business. He could not by any appropriate route to his room or to the place of another customer possibly have gone closer to the river than one hundred sixty-eight feet. No conceivable business purpose would have brought him to the riverbank or have put him into a position where he could accidently have fallen into the river in the vicinity of the brewery or in any vicinity where he could have had business for his employer. The applicant relies upon the fact that in the course of returning to his room Armstrong would be within the scope of his employment; that the same is true if he were on his way to

another customer; that if he crossed DuBois street before proceeding north he could have been exposed to the segment or jutting of the river heretofore referred to and might have fallen into the river at this point; that if he did so the current would normally bring his body to the spot where it was finally found. It is further urged that there is no proof that he ever arrived at his sister's or that he attempted to reach her place and, in any case, he did not need to go near the river to reach Windsor because he would normally cross by bridge or tube. He was never seen in Canada and the judgment of the pathologist as to the length of time the body was in the river is consistent with his having fallen in on the day that he left the brewery.

In addition to contentions based upon the facts it is contended by applicant that sec. 102.03 (1) (f), Stats. 1945, puts upon the employer the burden of proving the fact of deviation from the course of employment. It is further contended that, upon the introduction of evidence that deceased was in the service of his employer when last seen, applicant is entitled to a presumption that he continued in his employment and that he was so engaged at the time of his death.

We do not find it necessary to discuss or determine the merits of these contentions because we conclude that, even if the burden of proof is upon the employer to show deviation, and even though the applicant is entitled to the presumption just referred to, there is evidence to support the commission's finding that decedent at the time of his accidental drowning was not performing services growing out of and incidental to his employment. It is obvious that evidence sufficient to sustain this burden is sufficient to rebut the presumption. In commenting upon the evidence it should be kept clearly in mind that the commission was not seeking a complete explanation of the circumstances of decedent's death. Had this been the objective it is probably true that such an explanation could only be arrived at by guess. The issue is whether there is substantial evidence that at the time of his death Armstrong

had deviated from his employment and was not performing services growing out of and incidental thereto. There is evidence from which the commission could find that decedent could not have approached nearer the north bank of the river than one hundred sixty-eight feet in the course of any operation remotely concerning services for his employer and that the execution of no business purpose could have exposed him to the hazards of the river. His path to his room, to the business place of another customer, or to Windsor required him to turn to the north upon leaving the brewery and to proceed to East Atwater street. He had no occasion whatever to go to the south because DuBois street was a dead-end street. There is the suggestion in respondent's brief that without making an important deviation Armstrong could have crossed DuBois street and reached the river in the vicinity of the inlet indicated on the map. There is no evidence in the record concerning this inlet other than the map which is put in evidence by stipulation, and the situation is indicated none too clearly by the map. However, it is evident from the map that the water did not come up to the East side of DuBois street and that it could only be reached by crossing a strip of land east of DuBois street, at least as wide as the street itself. There could be no purpose in walking over this strip except for idle curiosity or some other personal reason not connected with his employment. Had he done this it would not be a case where he had taken a slightly more indirect route to his room than would have been possible under the circumstances. It would be a deviation wholly unconnected with his employment.

Applicant's contention that the current of the river would have brought Armstrong's body to the spot where it was recovered is not persuasive, because it is evident that if he had fallen into the river at any spot north of that where the body was found the current would normally bring his body to the same place.

The argument based upon the pathologist's evidence as to how long Armstrong was in the river is of no great force because it is in conflict with that of the coroner who put the time in terms of hours and both the coroner and pathologist disclaimed any ability to arrive at the time with any degree of accuracy. The fact that nobody saw Armstrong in Windsor appears to us to have no inferential value. It simply means that no one was found who had seen him. Neither does the opinion of local officials that he had entered the river on the American side, if given the force of evidence, furnish any information as to the point at which he entered the river.

From the foregoing considerations we are of the view that the commission's findings are sustained by the evidence.

*By the Court.*—Judgment reversed and cause remanded with directions to enter judgment affirming the order of the commission denying compensation.